Filed 8/6/15; dissent by J. Stewart

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re I.C., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALBERTO C.,<br><br>    Objector and Appellant. | A141143<br><br>(Alameda County<br>Super. Ct. No. SJ12019578) |

Subdivision (d) of section 300 of the Welfare and Institutions Code[1] (subdivision d) authorizes the juvenile court to assert dependency jurisdiction over a minor if "The child has been sexually abused, or there is a substantial risk that the child will be sexually abused . . . by his or her parent or guardian or a member of his or her household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse."

On March 27, 2013, the Alameda County Juvenile Court sustained the allegation of a petition filed by the Alameda County Social Services Agency (Agency) to the effect that Alberto C., the presumed father, had sexually molested I.C., his four-year-old

---

[1]  Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

daughter.[2]  The dispositional order was not made until February 5 of the following year. The court declared daughter I.C. a dependent child, and placed her in the custody of her mother.  The unusual feature was that the court, because of the jurisdictional finding, made these determinations:  "The Court finds that the Agency has sustained its burden of proof and will order that the father be continued to be removed from the family home until further order of the court.  [¶] . . . [¶]  There is clear and convincing evidence that the child must be removed from the physical custody of the father . . . based upon the following.  The child has been sexually abused or is at substantial risk of abuse by a parent . . . and there is no [other] reasonable means of protecting the child."

Alberto appeals, contending that both the jurisdictional and the dispositional findings are without the support of substantial evidence.  Alberto further contends that the lengthy period between the jurisdictional and the dispositional hearings was excessive, unjustified, and contrary to section 352.  We conclude these contentions are without merit, and affirm.

The most notable feature of this opinion is the somewhat novel application of *In re Lucero L.* (2000) 22 Cal.4th 1227 (*Lucero*), where our Supreme Court held that juvenile court jurisdiction could be validly asserted when the sole evidence was the uncorroborated hearsay statement of a minor who was legally incompetent to testify.  In *Lucero*, the minor's hearsay statement of parental molestation was contained in the case worker's report, which was allowed as evidence by section 355 because it had " 'special indicia of reliability' " which made the minor's " 'truthfulness . . . so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility.' " (*Id*. at pp. 1246, 1249.)

Obviously, the " 'test of cross-examination' " does not refer to the minor, who is by definition incapable for being put to cross-examination.  Rather, it refers to the totality of evidence concerning the " 'surrounding circumstances' " that may establish the

---

[2]  An older brother was also a subject of the dependency, but the allegations concerning him were dismissed at the dispositional hearing, and he does not figure on this appeal.

2

truthfulness of the minor's hearsay statement.  Here, the hearsay statement was not only found in the caseworker's report, it was also contained in the video recording of the minor being interviewed, which formed the basis for the caseworker's report.  This was a circumstance we deem significant, because in viewing it the juvenile court was exercising its power to judge credibility, a power which is accorded the utmost respect by a reviewing court.  We conclude that the juvenile court's decision to receive evidence of the minor's statement—both in the form of words in the caseworker's report and the recording—is supported by substantial evidence and thus properly served as the basis for asserting the jurisdiction of the juvenile court over the minor as a dependent child.

### THE APPEAL WILL NOT BE DISMISSED

The Agency responds that we need not address the merits of any of Alberto's contentions because they are all "non-justiciable."  The Agency argues:  "Here, the court found the subdivision (d) allegation as to both parents true . . . and sustained jurisdiction.  The mother has not appealed.  In dependency cases, it is well settled that a jurisdictional finding good against one parent is good against both.  The minor is a dependent if the actions of either parent bring him within one of the statutory definitions of a dependent. [Citations.]  [¶]  Thus, whether the jurisdictional findings as to the father are supported by sufficient evidence does not affect the juvenile court's jurisdiction.  The juvenile court has dependency over I.C.  Father's challenge to jurisdiction is not justiciable.  As such, father's appeal in this regard should be dismissed."  The Agency takes the same position regarding the claim that section 352 was ignored.

In *In re I.A.* (2011) 201 Cal.App.4th 1484 (*I.A.*), our colleagues in Division Three provided a more thorough explanation of the basis for dismissing a parent's dependency appeal:

"It is a fundamental principle of appellate practice that an appeal will not be entertained unless it presents a justiciable issue. [Citation.]  The justification for this doctrine, which in general terms requires an appeal to concern a present, concrete, and genuine dispute as to which the court can grant effective relief, is well explained by Wright and Miller's hornbook of federal practice:  'The central perception is that courts

3

should not render decisions absent a genuine need to resolve a real dispute. Unnecessary decisions dissipate judicial energies better conserved for litigants who have a real need for official assistance. As to the parties themselves, courts should not undertake the role of helpful counselors . . . . Defendants, moreover, should not be forced to bear the burdens of litigation without substantial justification . . . . Perhaps more importantly, decisions involve lawmaking. Courts worry that unnecessary lawmaking should be avoided, both as a matter of defining the proper role of the judiciary in society and as a matter of reducing the risk that premature litigation will lead to ill-advised adjudication.' [Citation.]

"The many aspects of the justiciability doctrine in California were summarized in *Wilson v. L. A. County Civil Service Com.* (1952) 112 Cal.App.2d 450: ' "A judicial tribunal ordinarily may consider and determine only an existing controversy, and not a moot question or abstract proposition. . . . [A]s a general rule it is not within the function of the court to act upon or decide a moot question or speculative, theoretical or abstract question or proposition, or a purely academic question, or to give an advisory opinion on such a question or proposition. . . ." ' [Citation.] An important requirement for justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status. ' " ' "It is this court's duty ' "to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." ' " ' " ' [Citations.] When the court cannot grant *effective* relief to the parties to an appeal, the appeal must be dismissed. [Citation.]" (*I.A.*, *supra*, 201 Cal.App.4th at pp. 1489–1490.)

Our Division Four colleagues also said this: "On this appeal, Father asks us to review the evidentiary support only for the juvenile court's jurisdictional findings involving *his* conduct. Because he does not challenge the jurisdictional findings involving Mother's drug abuse, however, any decision we might render on the allegations involving Father will not result in a reversal of the court's order asserting jurisdiction.

4

The juvenile court will still be entitled to assert jurisdiction over the minor on the basis of the unchallenged allegations. Further, the court will still be permitted to exercise personal jurisdiction over Father and adjudicate his parental rights, if any, since that jurisdiction is derivative of the court's jurisdiction over the minor and is unrelated to Father's role in creating the conditions justifying the court's assertion of dependency jurisdiction.

"Under these circumstances, the issues Father's appeal raises are ' "abstract or academic questions of law" ' [citation], since we cannot render any relief to Father that would have a practical, tangible impact on his position in the dependency proceeding. Even if we found no adequate evidentiary support for the juvenile court's findings with respect to his conduct, we would not reverse the court's jurisdictional and dispositional orders nor vacate the court's assertion of personal jurisdiction over his parental rights." (*I.A.*, *supra*, 201 Cal.App.4th at p. 1492.)

However, dismissal is not mandatory; the reviewing court has discretion to reach the merits. (*I.A.*, *supra*, 201 Cal.App.4th at p. 1493.) And speaking to the particulars of that discretion, one Court of Appeal stated: "[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M*. (2012) 211 Cal.App.4th 754, 762–763.)

Jurisdiction in *I.A*. was asserted because the juvenile court concluded that both parents had failed to protect and provide for the infant minor, who thus came within subdivision (b) of section 300. It is one thing to pass on examining the evidence of a non-appealing parent's substance abuse. It is something else entirely to deny review to a parent accused of sexually abusing his own daughter. There is perhaps no greater stigma. (See *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1752 ["Few crimes carry

5

as much . . . social opprobrium as child molestation"].)  The collateral consequences could be significant.  (See *In re Quentin H*. (2014) 230 Cal.App.4th 608, 613.)

Moreover, the jurisdictional finding effectively served as the basis for part of the dispositional order, which in plain effect directed Alberto to live apart from his children. Even if juvenile jurisdiction remains proper, reversal of the dispositional order would allow Alberto to live in the same home with his daughter, even if she remains a dependent.  This is hardly an academic interest to any parent.

For each of these reasons, the appeal will not be dismissed and the merits of Alberto's contentions will be addressed.

### THERE WAS NO PREJUDICIAL VIOLATION OF SECTION 352

"Continuances are disfavored in dependency cases."  (*In re Giovanni F*. (2010) 184 Cal.App.4th 594, 604.)  This policy is reflected in section 352, which provides:

"(a)  Upon request of counsel for the parent, guardian, minor, or petitioner, the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that no continuance shall be granted that is contrary to the interest of the minor.  In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements.

"Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance.  Neither a stipulation between counsel nor the convenience of the parties is in and of itself a good cause.  Further, neither a pending criminal prosecution nor family law matter shall be considered in and of itself as good cause. Whenever any continuance is granted, the facts proven which require the continuance shall be entered upon the minutes of the court.

"In order to obtain a motion for a continuance of the hearing, written notice shall be filed at least two court days prior to the date set for hearing, together with affidavits or

declarations detailing specific facts showing that a continuance is necessary, unless the court for good cause entertains an oral motion for continuance.

"(b)  Notwithstanding any other provision of law, if a minor has been removed from the parents' or guardians' custody, no continuance shall be granted that would result in the dispositional hearing, held pursuant to Section 361, being completed longer than 60 days after the hearing at which the minor was ordered removed or detained, unless the court finds that there are exceptional circumstances requiring such a continuance.  The facts supporting such a continuance shall be entered upon the minutes of the court.  In no event shall the court grant continuances that would cause the hearing pursuant to Section 361 to be completed more than six months after the hearing pursuant to Section 319.

"(c)  In any case in which the parent, guardian, or minor is represented by counsel and no objection is made to an order continuing any such hearing beyond the time limit within which the hearing is otherwise required to be held, the absence of such an objection shall be deemed a consent to the continuance.  The consent does not affect the requirements of subdivision (a)."

Here, the hearing held pursuant to Section 319—the initial petition hearing where the minor was detained—was on September 17, 2012.  The jurisdictional hearing commenced on December 3.  Both parents were present.  After watching a tape of I.C. being interviewed about the alleged molestation, counsel for the mother advised the court that she—counsel—did not feel well.  With the approval of all counsel present, the court continued the matter for further hearings on January 14 and January 25 of 2013.

At the January 14 hearing, a question arose as to whether this and the January 25 hearings were for a combined jurisdictional and dispositional resolution (as Alberto's counsel believed), or just the jurisdictional phase.  The court ruled that the two proceedings would be bifurcated.

At the January 25 hearing, there were two references to section 352.  The first arose in the context of Alberto's counsel stating to the court her (counsel's) "request . . . that she have a conversation with my client to see how we can do better on visitation."  I.C.'s counsel, after ascertaining "the date of the detention in this case" was "9-17,"

7

reminded the court that "So we are right up against the six-month deadline." Counsel for Alberto responded: "Judge, these deadlines are important, but also, my client's Sixth Amendment rights are very important on a case of this magnitude." The second reference also arose in the context of visitation. As the hearing was winding down, counsel for the Agency told the court, "Your Honor, we've had this case open since September," to which Alberto's counsel replied, "Why does that matter?" There followed a brief discussion concerning changing the visitation schedule, with Alberto's counsel "just asking that we do the supervised visits with somebody not from the Agency." When the court told assembled counsel "we have five minutes," there was no protest when "the next hearing" was set for March 14.

It was at 4:30 on March 14, and Alberto's adult daughter was testifying, that counsel for Alberto asked "if she's available tomorrow." When the court indicated "we will resume tomorrow," Alberto's counsel did not object.

The March 15 resumption of the jurisdictional hearing opened with the court inquiring of Alberto's counsel, "did you have another witness to call?" Counsel did not, whereupon the court heard extensive argument whether the allegations of the petition should be sustained. At the conclusion of argument, the court took the matter under submission. The court and parties were discussing the next court date when counsel for the minor and the Agency expressed concern about the passage of time. As counsel for Agency put it: "My concern is if, as Mr. Waring [counsel for I.C.] stated, assuming innuendo [*sic*] that we take jurisdiction, I don't want to continue it another month to do a dispo hearing, and then call witnesses and go to multiple hearings, and then we'll be nine, ten months out to detention." Alberto's counsel replied: "It's certainly a burden on the parties, as well, but I can't truncate the procedure and be prepared to do what I need to do to protect my client and do a good job if you don't know what the ruling is on jurisdiction." The court then set March 27 for a jurisdictional decision, and April 15 "for possible disposition hearing."

On March 27, after sustaining some of the allegations in the Agency's petition (see fn. 2, *ante*), the juvenile court inquired "Have the parties had any discussions about a date

8

for disposition?"  Alberto's counsel replied:  "I think we already have a date, was reminded by your good court officer, that it's April 15th."

On April 15, the court opened the hearing by stating:  "[I]t's my understanding that the parties need to select a new date for the contested [dispositional] hearing in this matter.  Have you discussed that already?"  Albert's counsel responded that "all of us discussed that . . . and . . . [w]e can't do right now."  With counsel's approval, the court set April 22 and "just as a safe measure, we'll also set May 13th . . . for continued disposition hearing."

The judge who had presided up to this point was unavailable on April 22.  Before another judicial officer, and without objection from any counsel, it was agreed that the next hearing would be on May 13, with a "second session" if needed for June 24.

The dispositional hearing commenced on May 13.  During the course of the hearing the court admitted certain reports from the Agency in evidence, took judicial notice of the testimony of certain witnesses at the jurisdictional hearing, and commenced hearing live testimony.  No one objected when the matter was continued to June 24.

Further sessions of the dispositional hearing were held on June 24, July 10, August 16, August 20, October 21, November 4, December 2, December 20, of 2013, and January 16, January 22, January 29, and February 5 of 2014.  An examination of the hundreds of pages of reporter's transcripts for these dates establishes that at no point did counsel for Alberto mention section 352.  On the contrary, the record shows that counsel mounted a vigorous defense that involved engaging experts, seeking to have discovery reopened, and updating reports already on file.  Indeed, virtually all of the November and December 2013 hearings were devoted to the testimony of Alberto's experts.  The remaining hearings were occupied by final argument.

It appears that, apart from the solo references by counsel for I.C. and the Agency, the requirements of section 352 were almost entirely honored in the breach by all concerned.  However, "[s]ection 352 does not supply a penalty for noncompliance," and a dispositional order will be reversed only if prejudice can be shown from the unauthorized delay.  (*In re Angelique C*. (2003) 113 Cal.App.4th 509, 523.)  The reason

9

we find the error nonprejudicial is the largely the same for requiring a contemporaneous objection at trial.

"In order to preserve an issue for appeal, a party ordinarily must raise the objection in the trial court.  [Citation.]  'The rule that contentions not raised in the trial court will not be considered on appeal is founded on considerations of fairness to the court and opposing party, and on the practical need for an orderly and efficient administration of the law.'  [Citations.]  Otherwise, opposing parties and trial courts would be deprived of opportunities to correct alleged errors, and parties and appellate courts would be required to deplete costly resources 'to address purported errors which could have been rectified in the trial court had an objection been made.'  [Citation.]  In addition, it is inappropriate to allow any party to 'trifle with the courts by standing silently by, thus permitting the proceedings to reach a conclusion in which the party could acquiesce if favorable and avoid if unfavorable.'  [Citation.]"  (*In re S.C.* (2006) 138 Cal.App.4th 396, 406.)  This sort of behavior is condemned as "bait and switch on appeal" (*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 830) and " ' "intolerable." ' "  (*In re S.B.* (2005) 130 Cal.App.4th 1148, 1159.)

It was not Alberto who raised section 352 to the juvenile court.  It was in fact counsel for the minor and then the Agency who broached the subjects of delay and, by implication, section 352.  It was in response to the former's caution that Alberto's counsel insisted his client's "Sixth Amendment rights" were more important.  Had Alberto actually complied with the requirements of section 352 and sought a continuance, he might very well have been granted one in order to secure the testimony of the experts he eventually presented at the dispositional hearing.  But it is one thing for Alberto, as is his perfect right, to seek to have the dispositional order reversed because it lacks the support of substantial evidence.  But it is not acceptable to seek the same result on the basis of statutory noncompliance for which he bears considerable responsibility.

**SUBSTANTIAL EVIDENCE SUPPORTS THE FINDINGS**

Established criteria govern Alberto's claims that the juvenile court's crucial findings made at the jurisdictional and dispositional hearings do not have the support of

10

substantial evidence. " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

## The Jurisdictional Finding

The problem of a minor child's accusation of parental molestation has vexed the courts and the Legislature. All concerned appreciate the tension between the need for protecting children and the fear of accepting an unfounded accusation. The problem is most acute when, like here, there is no direct or tangible proof that any molestation occurred.

Eventually, following adoption of section 355, which itself followed *In re Cindy L.* (1997) 17 Cal.4th 15 (*Cindy L.*), our Supreme Court stated the following principles: " 'The spontaneity of the declarations lend[s] credibility to the exclamations of a hearsay declarant who might be otherwise incompetent, due to minority or other valid reasons, to testify at trial.' [Citation.] . . . [T]he fact of the child's incompetence to testify does not prevent a court from finding that the various circumstances surrounding the statement— not only its spontaneity, but also the precociousness of the child's knowledge of sexual matters, the lack of motive to lie, and other factors[3] . . . lead to the conclusion that the

---

3 " 'The child here was of a very young age such that it is unlikely that the accusation was fabricated or the product of imagination. The statement accusing [the] father of molestation was spontaneous rather than the result of suggestive or leading questioning.

statement bears special indicia of reliability and is therefore admissible. . . . .' " (*Lucero, supra*, 22 Cal.4th at p. 1246.) Corroboration is not constitutionally required, but the court "emphasize[d] the importance of judicial court scrutiny of the statements of young children who are both legally incompetent and insulated from cross-examination. . . . [T]he court may rely exclusively on these out-of-court statements only 'if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility . . . .' " (*Id.* at p. 1249.)

Quoting from its analysis in *Cindy L.*, *supra*, 17 Cal.4th 15, 29–30, which was based on the United States Supreme Court decision in *Idaho v. Wright* (1990) 497 U.S. 805, the *Lucero* court held: " 'The nonexhaustive list of factors that the United States Supreme Court has cited as relevant to the reliability of hearsay statements made by child witnesses in sexual abuse cases are (1) spontaneity and constant repetition; (2) the mental state of the declarant; (3) use of terminology unexpected of a child of a similar age; and (4) lack of motive to fabricate.' " (*Lucero*, *supra*, 22 Cal.4th 1227, 1239.) Later in its opinion the court reiterated that "the factors bearing on a statement's reliability are not limited to those specifically enumerated in *Cindy L.* or *Idaho v. Wright*—any factor bearing on reliability may be considered." (*Id.* at p. 1250.)

The *Lucero* court also reiterated: "We must uphold the [juvenile] court's [jurisdictional] findings if they are supported by substantial evidence. [Citation.] The decision of the juvenile court, if correct, will be upheld even if the stated reasons for the decision are erroneous or incomplete." (*Lucero*, *supra*, 22 Cal.4th 1227, 1249–1250.)

---

Independent evidence was consistent with the statement. The statement was made not once but several times, and various recitations were consistent. The wording of the statement both in its Spanish terminology and its use of infantile descriptive words indicate no coaching . . . . Other adult males lived in the same household, but no accusation was made against them, which indicates a lack of indiscriminate or random accusations. Finally there appeared no motive for Carmen to lie or exaggerate in her statements: The evidence was that she loved her father, played with him, and apparently, did not become disaffected from him because of his sexual acts with her.' " (*Cindy L.*, *supra*, 17 Cal.4th 15, 24, quoting *In re Carmen O.* (1994) 28 Cal.App.4th 908, 921.)

12

The principles outlined in *Cindy L.* and *Lucero* were clearly in the juvenile court's mind when it made its decision at the jurisdictional hearing. Because of the obvious attention which the court gave to that decision, it merits quotation in full:

"This is a very difficult case because the evidence comes from a three-year-old child, who at times, was very clear in her statements about what happened, and at other times was very unclear, and at times very confusing about the statements that she makes concerning what she alleges [*sic*] her father did to her.

"Essentially, all the Court has to go on in this case is the hearsay statements of a three-year-old minor. . . . There are no witnesses to the events she describes. The only persons present on the date of the incident she describes were her and her father.

"Under Welfare and Institutions Code Section 355, subsection (c)(1)(B), the Supreme Court has ruled that the hearsay statements of the minor under the age of 12 are admissible and can be used by the Juvenile Court to establish jurisdiction if the statements have some indicia of reliability and are found by the Court to not be the product of fraud, deceit, or undue influence. In other words, if the Court finds that the time, content and the circumstances of the statement provide a sufficient indicia of reliability, they can be used as a basis for the Court in taking jurisdiction of a [dependency] matter.

"In both *In re Cindy* and *In re Lucero*, the Court provided some guidelines as to the factors that can be used to determine the reliability of the statements of a minor under the age of 12. Those factors include the spontaneity in which those statements are made, the consistency in which the statements are made, the lack of prompting on the part of any party, and the lack of a motive to lie.

"In this particular case, in trying to reach a decision, the Court has reviewed the evidence, [to] find what facts and circumstances support a conclusion that the statements made by a minor regarding the actions of her father are reliable, and what supports a conclusion that they are not reliable, what supports reliability. The Court believes that when the minor made the statement to her mother that 'Daddy put penis on me,' this was a statement that came out of the blue. It was completely spontaneous. It was not a

13

product of the prompting on the part of the mother. The mother was caught completely off guard by the statement relating to the actions of the father.

"At the time the minor made the statement to the mother they were not in the middle of the discussion of what occurred in July or any other matters of a sexual nature.

"When she made—when the minor made the same allegations shortly thereafter to the staff at the day care center, again, the statements were completely spontaneous.

"She has consistently repeated the same core allegations to various people: Her mother, the day care center staff, and the Calico staff.[4]

"In fact, on the Calico tape, she depicted the incident with great detail, using gestures, hand signs, words, and actions, as were noted in the police report. She repeats the details throughout the 40 minutes or so of the interview.

"She was not prompted by any adults that she talked to. She was not prompted by her mother. She was not prompted by the day care staff, nor was she prompted by the Calico interviewers.

"And the Court can find no evidence that she has a motive to lie about the statements that she made.

"What supports unreliability: Her very confusing statements about the train and the flower as it relates to the father. It's very difficult to follow her thought process in relating the train and the flower to her father. It leads one to believe that maybe she's having some sort of flashback to the July encounter with the eight-year-old.

"But of course, the difficulty in assessing this is that there's no credible evidence that would support the conclusion that she was experiencing some flashback to the July incident or that there was some psychological event that was—that was leading her to recall the events of July and project those events on the father.

"Another piece of evidence that one could conclude leads to the unreliability of her statements is that she made statements during the course of her Calico interview that

---

4 CALICO is an acronym for the Child Abuse Listening, Interviewing and Coordination Center.

14

both her stepsister, RJ, was in the bed with her and her father, and two other girls, that they were all naked, and the father was wanting to do bad things to them, to each one of them. These statements are not believable, and in fact, were denied by RJ.

"Her statement on the Calico tape that she had an encounter with the father on the couch at Calico was not correct and it's unreliable.

"And there's this possibility, and the theory that somehow or another she's recounting and having a flashback to the July incident with the eight-year-old, somehow or another that's being projected on the father. All of that could lead one to believe that the statements about the father and father putting his penis on her are unreliable.

"So there's supporting evidence on both sides. There's evidence that supports reliability of her statements, and there's evidence that supports a conclusion that her statements are unreliable.

"But the Court finds the evidence that supports the reliability more compelling. The Court does not subscribe to the theory that the minor is having a flashback to the July incident and is projecting that incident onto the father.

"There's several distinctions between the July incident and the statement made by the minor regarding the September encounter with the father. For example, in reviewing the police reports, the July incident—in the July incident, the minor never used the word penis to describe her experience with the eight-year-old. Although the mother testified that the word penis was a word that was used in the home before the July incident, the minor did not say that the eight-year-old had used his penis. She only referred to a train being used. And according to the observations of her brother, a toy train was used in that incident.

"In the September incident, although she talked about a train and she talked about a flower, she was very clear in her statement that, 'Daddy put his penis on me.'

"She did not refer to anyone other than the father, she did not mention the eight-year-old, and she did not mention any other male in the house, including her brother, when she made these statements initially to her mother.

15

"In the July incident, both the mother and the brother were at home.  In her Calico statements, she was very clear that the encounter with her father occurred while her mother was at work and while her brother was at school.  It's a very different scenario than the scenario in the July incident.

"The morning after she told her mother what had happened, she didn't want her mother to go to work, apparently not wanting to be alone with the father at that time.

"And an additional, at the Calico interview, she stated that what her father did to her hurt, and she indicated that during the course of the interview, it hurt when she made certain movements.

"So to this Court, reviewing all the evidence that's been presented, the core allegations of the minor have remained consistent, they have remained spontaneous throughout the recounting of this incident, and the Court can find no motive on her part to lie about this.  The Court can find no credible evidence that there is or was a psychological process that was involved here that caused the minor to somehow misstate what had happened to her in July with what she claims her father did to her.  The Court can find no evidence of any fraud or any deceit or any undue influence.

"And therefore, in this, what the Court finds to be a very difficult case, the Court will sustain the allegations and find true by a preponderance of the evidence that the allegations of the petition . . . are true. . . .  And so the Court will take jurisdiction of this matter."[5]

---

[5]   The sustained allegations read as follows:

"D-1.  The minor . . . has been sexually molested by her father, while living [at] the home of the mother and father in that: [¶]  a.  On more than once occasion, [the minor] has spontaneously stated to others and to her mother, 'Daddy put his penis on me.'  [¶]  b.  [The minor] has pointed to her vaginal area and complained that it hurts.  [¶]  c.  [The minor] states that her father put foreign objects in her vagina, including a 'flower,' a 'train' and that 'did not feel good.'  [¶]  d.  [The minor] states that her father will take off her clothes and he will take off his clothes and lay on her bed with her, and kiss her in the mouth.  [¶]  e.  [The minor] states that her father kisses her vagina when she is in her brother['s] . . . bed.  [¶]  f.  [The minor] states that she watched a movie where a boy kisses a girl and a girl kisses a girl, and they were not wearing clothes.

As the juvenile court implicitly noted, I. C. did not testify, and the only available evidence from her was the hearsay statements she made that were recounted by others, or that were preserved on the recording of I. C.'s interview by Calico staff that was viewed by the court.

In her opening brief, Alberto's counsel does a thorough job of dissecting the weaknesses and inconsistencies of I. C.'s statements, with the aim of tying the accusations, not to Alberto, but to the eight-year-old child of a neighbor. But the ineluctable reality is that the juvenile court determined that those statements were credible on the issue of Alberto behaving in a sexually inappropriate manner. And, to judge from the comments just quoted, that determination was clearly based in large part on the court's opinion of what was seen on the videotape. Such a credibility determination qualifies as a legitimate consideration, one of the non-enumerated factors "bearing on reliability" permitted by *Lucero*.

That is the significant difference between the juvenile court's decision in *Lucero* and the one here. The Supreme Court framed the issue for review as follows: "[W]e consider whether the hearsay statements contained in a social study of a minor who is the subject of a section 300 hearing . . . may be admitted and relied on . . . if such statements fail to measure up to the standards of reliability prescribed in *Cindy L.*" (*Lucero*, *supra*, 22 Cal.4th 1227, 1231.) It appears that there was a videotape interview of the victim in *Lucero* but the only mention of it in the opinion is that it was seen by the expert witnesses who testified at the jurisdictional hearing. (*Id*. at pp. 1235–1236 ["Psychologist Ricardo Weinstein, for the parents . . . view[ed] the videotaped interview between Lucero and Officer Ramirez"; "Psychologist Constance Dalenberg testified for the County [¶] . . . [¶] [having] . . . watched the videotaped interview of Lucero"].) In other words, there is nothing to indicate it was seen by the juvenile court in *Lucero*. By contrast, here the

---

[¶] . . . [¶] D-3. The mother does not believe that the father has sexually molested the minor . . . ."

17

videotape was seen by the juvenile court, and, as will be seen, figured prominently in the court's decision to assert jurisdiction.

*Lucero* carried forward from *Cindy L.* its approval that a trial court could "find[] that 'the time, content and circumstances of the statement provide sufficient indicia of reliability,' " also known as " 'special indicia of reliability.' " (*Lucero*, *supra*, 22 Cal.4th at pp. 1246–1248.) The "time, content and circumstances" is virtually the same language used in Evidence Code section 1360, which exempts from the hearsay rule in criminal trials statements made by a child under the age of 12 describing "any act of child abuse or neglect."[6] The application of Evidence Code section 1360 in *People v. Eccleston* (2001)

---

[6] The relevant language of Evidence Code section 1360 is subdivision (a), which provides: "In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another . . . is not made inadmissible by the hearsay rule if all of the following apply: [¶] (1) The statement is not otherwise admissible by statute or court rule. [¶] (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability. [¶] (3) The child either: [¶] (A) Testifies at the proceedings. [¶] (B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child." Evidence Code section 355 appears to use the words "reliability" and credibility" interchangeably. (See Evid. Code, § 355, subds. (c)(1)(B) [statement "shall not be admissible if the objecting party establishes that the statement is unreliable because it was the product of fraud, deceit, or undue influence"], (d) [Evid. Code, § 355 "shall not be construed to limit the right of a party to . . . introduce admissible evidence relevant to the weight of the hearsay evidence or the credibility of the hearsay declarant."].) *Lucero* appears to reflect the Supreme Court's established practice of treating the concepts of "reliability" and "credibility" as more or less synonymous. (See, e.g., *People v. Dykes* (2009) 46 Cal.4th 731, 779 ["the testimony was relevant to Monda's credibility and reliability as a witness"]; *People v. Salcido* (2008) 44 Cal.4th 93, 107 ["That testimony . . . was relevant to the credibility and reliability of various witnesses"]; *People v. Tewksbury* (1976) 15 Cal.3d 953, 967 ["an attack on the credibility of a witness is also a challenge to the reliability of his testimony"]; cf. CALCRIM No. 105 ["In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony."].) This court has taken the position that "[a]ttempting to frame the issues as one of 'reliability' is really no more than a challenge to witness credibility." (*People v. Barnes* (2013) 216 Cal.App.4th 1508, 1520 and authorities cited; cf. *Foster v. California* (1969) 394 U.S. 440, 443, fn. 2 ["The reliability

18

89 Cal.App.4th 436 is particularly illustrative. It also involved a videotape of an interview whose admission was sharply contested at a pretrial hearing and which was viewed by the trial court before making its ruling that the tape could be played to the jury. (*Id*. at pp. 440, 441.)

The reviewing court in *Eccleston* was conducting an independent review because the constitutional right of confrontation was at issue in a criminal proceeding. (See *People v. Eccleston*, *supra*, 89 Cal.App.4th 436, 445–446, citing *Lilly v. Virginia* (1999) 527 U.S. 116, 136.) Nevertheless, it also reviewed the videotape of the interview (*People v. Eccleston*, *supra*, at p. 440, fn. 2) on the way to upholding the trial court's decision to allow admission.

This is not a criminal case, and Alberto makes no claim of constitutional violation. He does not assert that the juvenile court misapplied the correct legal standard, only that the juvenile court's ruling to rely on I. C.'s Calico statement is not supported by substantial evidence. In addressing Alberto's claim, we cannot exercise the far greater powers of independent review. As already shown, our limited powers do not extend to credibility determinations or reweighing the evidence. But we do not believe the videotape is to be ignored, or reduced to nothing more than the source of statements in the caseworker's report. We do not believe *Lucero* put it off-limits, particularly when the videotape is the original, and far more detailed, source of information for the juvenile court.[7] The obvious analogue is the widespread use of police interview/interrogation

_____

of properly admitted eyewitness identification, like the credibility of other parts of the prosecution's case is a matter for the jury"].)

[7] A pair of examples will suffice on this point. The transcript of the Calico interview has I.C. stating that Alberto "put penis on me." When the interviewer asks "Where on you?" the transcript has the answer as "Here (indicating)." But the tape unmistakably shows I.C. spreading her legs, putting single fingers from both hands together, and then making a thrusting motion at her crotch area. The child tells the interviewer that her father did this "five times" (pointing her right index finger in and out), and it felt "not good" (again indicating at her crotch area) And when the child recounts that "he didn't listen to me when I say 'stop it' . . . because he can't do that to touch me here (indicating.) . . . Don't do that . . . That's mine . . . leave my vagina [pronounced "va-

19

videotapes that are routinely shown to juries. (Cf. *People v. Avila* (2006) 38 Cal.4th 491, 592 ["hearing Rojas's manner of speaking in the police interviews might have assisted the jury in determining credibility"].)

It is clear from numerous comments made during its thoughtful and comprehensive ruling that the juvenile court was indeed using the videotape as the source of its conclusions, including some that favored Alberto, who has never contested its admission in evidence. Equally clearly, the court was accepting some utterances by I.C. during the Calico interview as significant and more reliable than others. Such discrimination was undoubtedly included in its powers to evaluate the evidence, the same power exercised by any trier of fact in any context viewing a recording or depiction, and the exercise of which is conclusive for purposes of this appeal. (*In re I.J.*, *supra*, 56 Cal.4th 766, 773; *In re Megan S.* (2002) 104 Cal.App.4th 247, 251; see *People v. Mayfield* (1997) 14 Cal.4th 668, 748 ["the videotape bore directly on the credibility of defendant's testimony"].) Equally clear is that the court weighed the evidence on the crucial point ("the Court finds the evidence that supports the reliability more compelling"). That too is beyond our power to revisit. (*In re I.J.*, *supra*, at p. 773 [" ' "We do not reweigh the evidence" ' "].)

"However," Alberto argues, "it is important to remember that in rendering its decision, the Supreme Court in *Lucero L.* stated that the questions of admissibility versus substantiality were separate but different. ([*Lucero*], *supra*, 22 Cal.4th at p. 1244.) In this instance, father did not argue against the admissibility of I. C.'s statements at the [jurisdictional] hearing but rather questioned whether the statements by themselves reached the level of substantial evidence to support the jurisdictional findings. In *Lucero L.* and *Cindy L.*, other evidence existed to support the jurisdictional findings," whereas here "no evidence was presented to bolster or lend credence to I. C.'s allegations."

---

geena"] alone . . . I said don't do that . . . If you do that then [you're] going to be in trouble . . . Then he didn't—he didn't leave me alone still . . . he still bothers me," the child's voice high and agitated.

We shall not assume that Alberto is making an attempt to impose a corroboration requirement that our Supreme Court expressly declined.[8] (See *Lucero*, *supra*, 22 Cal.4th at p. 1249 ["the court may rely *exclusively* on . . . out-of-court statements," italics added].) We can only assume that Alberto does not agree with the juvenile court's determination that I.C.'s statements did bear sufficient indicia of reliability to satisfy

---

[8]  Still, some corroboration was present in the form of the child's fear at being left alone with Alberto, a point mentioned by the juvenile court. Our dissenting colleague believes we have discovered corroboration only by bootstrapping the minor's statements. Not so. This is the mother's testimony:

"Q. Now, . . . after she told you the night before about her father, she asked you not to leave her and go to work, right?

"A. I asked her to repeat what she told me the night before, and she did ask me not to go to work.

[¶] . . . [¶]

"Q. If you went to work that morning and left her at home, who would she have been home with?

"A. She would have been home with her father.

"Q. And anybody else?

"A. If someone came over, but no.

"Q. You weren't expecting anybody to come over, right?

"A. No."

"Q. So the day after your daughter . . . said that her father had touched her inappropriately, was part of the reason you took her to school that day was so that she . . . wouldn't be alone with your husband?

"A. I couldn't know, so yes."

The inference of the daughter's fear of being left with Alberto thus comes, not from the daughter's hearsay and incompetent testimony, but from the mother's testimony about her—the mother's— reaction. It was the mother who believed her daughter was afraid to be left alone with her father. It was the mother who acted on that perceived fear by not leaving her daughter home alone with Alberto. These are reasonable inferences which we must accept were drawn by the juvenile court, and which must be respected here, particularly as they involve the weighing and credibility of *the mother's testimony*. (*In re I.J.*, *supra*, 56 Cal.4th 766, 773.) And those inferences are circumstantial evidence, and corroboration of the daughter's hearsay statement. The mother's testimony, and her actions, corroborate her daughter's fear, and the implicit reason for that fear. (See *In re B. D.* (2007) 156 Cal.App.4th 975, 984 ["corroborating evidence is that which supports a logical and reasonable inference that the act described in the hearsay statement occurred"], 986 ["It would be reasonable to infer from this evidence that B.D. was afraid of his mother. This fear could corroborate" evidence of abuse]; cf. *People v. Riccardi* (2012) 54 Cal.4th 758, 822 [person's fear corroborated by subsequent conduct].)

21

*Lucero* and hopes we would reach the opposite conclusion. But that is merely arguing how some of the evidence should be treated, and which parts of I.C.'s Calico statement should carry greater weight.[9] Such an approach cannot prevail on a substantial evidence appeal.

We do not deny the validity of the juvenile court terming this "a very difficult case." But the difficulty was addressed to that court, not to this court of review. (See *James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1021 ["The Court of Appeal is not a second trier of fact . . ."].) The issue here is not whether we think I.C.'s statements bear sufficient indicia of reliability to satisfy *Lucero*, but whether substantial evidence supports the juvenile court's finding that they did. (See *In re Laura F.* (1983) 33 Cal.3d 826, 833 ["[O]ur task is not . . . to express an independent judgment thereon but merely to decide whether there is sufficient evidence to support the findings of the trial court."].) The juvenile court took particular pains to state its reasoning as to why it found I.C.'s evidence reliable according to the *Lucero* and *Cindy L.* criteria. Given the scrupulousness with which the juvenile court evaluated the pros and cons of the hearsay statements, there is no basis on this record for overturning the juvenile court's jurisdictional finding.

### The Dispositional Finding

"A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . [that] . . . [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the parent's . . . physical custody. The fact that a minor has been adjudicated a dependent child . . . shall constitute prima facie evidence that the

---

[9] We note that Alberto does not challenge the court's findings that I. C.'s statements were not the result of prompting, and she had no motive to fabricate her statements.

minor cannot safely be left in the physical custody of the parent . . . . The court shall consider . . . the following: [¶] (A) The option of removing an offending parent from the home." (§ 361, subd. (c).) The court is also to consider whether "[t]he minor . . . has been sexually abused, by a parent, . . . and there are no reasonable means by which the minor can be protected from further sexual abuse or a substantial risk of sexual abuse without removing the minor from . . . her parent . . . ." (*Id.*, subd. (c)(4).) Although the burden of proof is different, the reviewing court will still apply the substantial evidence standard. (*In re Noe F*. (2013) 213 Cal.App.4th 358, 367; *In re Miguel C*. (2011) 198 Cal.App.4th 965, 969.)

Again, the juvenile court's decision merits full quotation:

"[T]he issue before the Court today for disposition is whether or not the father should be removed from the home for the minor's safety and protection. In other words, should . . . the minor be removed from the physical custody of the father?

"The Agency has the burden of proof in this matter. The Agency must establish by clear and convincing evidence that there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the father were allowed to return home and if there are no reasonable means by which to protect the safety of the minor.

"Also, the Agency would have the burden of proving the minor was sexually abused by the parent and there are no reasonable means by which the minor can be protected from further sexual abuse or there's a substantial risk of sexual abuse without removing the minor from the parent, and in this case, allowing the father to return home.

"During the course of this hearing the parties presented experts to testify on the risk of the father sexually abusing the minor if he returned home. The Agency presented Dr. Abbott, and the father presented mainly Dr. Lask and Dr. Dempsey.

"The Court's reviewed the testimony of these witnesses. As to Dr. Lask, the Court concludes that it can give no weight to his testimony, mainly because of his method of administering one of the tests during his assessment of Mr. C[.], that virtually all the other experts testified . . . was completely inappropriate and unorthodox. And that was

23

specifically allowing the father to take a test home, to do the test on his own and complete it at home. Both Dr. Dempsey and Dr. Abbott testified that this was completely inappropriate. So the Court is going to give very little weight, if any at all, to Dr. Lask's testimony and his assessment.

"As to Dr. Dempsey, the Court reviews her assessment and testimony in a more positive and favorable light, though the Court cannot accept her conclusions. The problem that the Court has with her assessment is that as Dr. Abbott testified the method that she used for this assessment was unreliable, and the Court agrees that the method that she used wasn't a reliable method of assessment.

"And also, the . . . static and dynamic risk factors that she [i.e., Dr. Dempsey] considered in her assessment were essentially part of Mr. C[.]'s makeup. These factors existed at the time that she did her assessment. These factors existed at the time that the sexual abuse occurred in this case. Based on her conclusion that there was a very low risk of recidivism, it would stand to reason that the risk of the initial offense was very low, yet the Court found that it did, in fact, occur. Therefore, the Court cannot rely upon her assessment of the low risk that Mr. C[.] would pose, if he were to return home.

"Based on the evidence in this case, the Court believes that the minor is at risk if the father returns home.

"Two important factors that the Court considered were the fact that the mother does not believe that the sexual abuse occurred, and given her disbelief, the Court believes that she would not be able to protect the minor from future sexual abuse by the father. And also, the mother's safety plan, in the Court's opinion, is not feasible. Given the requirements of everyday life, the needs of the family, there are going to be times where the minor would be left alone with the father.

"The mother's plan of having a relative from Marin County, and social worker friend, available on a moment's notice, is just not workable and is just not feasible.

"With the father in the home, he has access to the minor. And with that, the Court finds that there is or there would be a substantial risk of further sexual abuse if the father were to return home at this time. And so the Court finds that the Agency has sustained its

24

burden of proof in this matter and will order that the father continue to be removed from the family home until further order of the Court."

"In determining whether a child may be safely maintained in the parent's physical custody, the [juvenile] court may consider the parent's past conduct and current circumstances . . . ." (*In re Maria R.* (2010) 185 Cal.App.4th 48, 70.) This seems to be precisely what the court here did.

Although Alberto naturally does not accept its truth, the court could proceed on the basis that the molestation was established. (§ 361, subd. (c).) Moreover, as shown in the preceding discussion, the juvenile court's negative evaluation of Alberto's experts, Drs. Lask and Dempsey, is conclusive here, and Alberto cannot rehabilitate their testimony to impeach that jurisdictional finding. By contrast, Dr. Abbott, accepted as an expert in "risk assessment in sexual abuse cases," testified that a person who refuses therapy and counseling—as Alberto did—is eight times more likely to re-offend.

The juvenile court also had before it in evidence the report of the Agency's social worker for the case. (§ 358, subd. (b) ["the court shall receive in evidence the social study of the child made by the social worker"].) In her report, the social worker concluded that the minor would be at risk if Alberto were allowed to return home, particularly so if left alone with the minor, which occurred because the mother worked. This was the same social worker who the parties stipulated at the jurisdiction hearing could testify as an expert at risk assessment, and who had then testified that father should not be allowed back into the family home. She testified at the dispositional hearing that her recommendation to prevent Alberto from returning home was based in large part on the mother's inability to protect the minor: "In the past the mother has used the father for child care . . . , has left [the minor] home alone with the father, and I don't see where that has changed. Or would change at this point" while "the mother has a . . . regular 9 to 5" job, "doesn't think anything happened with the father," and that the minor "should be around her father." Asked point blank, "Do you believe that there's a safe way to have the father return home today in the same household as the mother and [the minor]?," the social worker responded, "No," because "I can't assure that the one parent is going to

25

protect the child from the other parent." And again: "Do you see any way for the father to return home today and still be able to protect [the minor] on a day-to-day basis?" The social worker's answer was "No, I do not."

The social worker's testimony and her report, each by itself, constitute substantial evidence. (Evid. Code, § 411; *In re Marriage of Chakko* (2004) 115 Cal.App.4th 104, 109.) When Dr. Abbott's testimony is added, the record contains ample substantial evidence to support the juvenile court's dispositional finding that the minor's safety required separation from Alberto. (§ 361, subd. (c)(4); *In re I.J.*, *supra*, 56 Cal.4th 766, 773; *In re Megan S.*, *supra*, 104 Cal.App.4th 247, 251.)

The dispositional order is affirmed.

_____

Richman, Acting P.J.

I concur:


_____

Miller, J.


A141143

27

Stewart, J., concurring and dissenting.

I dissent. I do not agree with the majority's conclusion that substantial evidence supports the juvenile court's exercise of jurisdiction and its dispositional order, issued after the court found I.C. had been sexually abused by her father Alberto. This finding was based solely on the uncorroborated, confused and unchallenged hearsay statements of I.C., a truth incompetent three-year-old child.[1] The majority reflexively defers to the juvenile court decision without regard to the constitutional standard prescribed by our Supreme Court in *In re Lucero L.* (2000) 22 Cal.4th 1227 (*Lucero L.*). As a result, it affirms a decision made on an unclear record that unjustly separated a father from his wife and children to the detriment of them all. I would reverse.

Before I.C. made her hearsay statements about Alberto, she and her mother (mother) had been discussing sexual abuse as a result of a recent incident in which I.C. suffered such abuse at the hands of an older child. I.C. then claimed Alberto abused her in the same manner. The court found her hearsay statements were suspect in significant respects but, in its view, more credible than not. The majority defers wholesale to the court's modest conclusion. In doing so, it abdicates this court's responsibility under *Lucero L.* to review the whole record for substantial evidence of I.C.'s *clear truthfulness*. As the juvenile court's own explanation of its ruling indicates, there is not substantial evidence to support such finding—the evidence is anything but clear.

At the heart of this case is the tension between the key objective in dependency proceedings of protecting children from abuse on the one hand and, on the other, the also important goals of ensuring that parents are not unjustly deprived of their liberty interests in raising their children, that children are not unnecessarily deprived of the benefits of growing up with two parents in an intact family and that a parent is not falsely labeled a

---

[1] I concur with the majority that Alberto's challenges to the juvenile court's orders are justiciable and that there was no prejudicial violation of section 352.

1

"child molester" with all the vilification and humiliation such a label brings.  This tension is particularly high when the evidence involves a young child's hearsay statements.  Twice our high court has grappled with what due process requires before the hearsay of a child too young to distinguish between truth and fiction can be considered and relied on in a juvenile dependency case.  *In re Cindy L.* (1997) 17 Cal.4th 15 (*Cindy L.*) held due process required both corroboration and particularized indicia of reliability before such evidence could be admitted and relied upon.  After the Legislature amended the law to make such statements in a social study admissible in certain circumstances (Welf. & Inst. Code § 355), our high court again addressed the requirements of due process in *Lucero L.*  Recognizing the crucial role of cross-examination in assessing a witness's credibility, the Supreme Court held that a juvenile court could rely solely on a child's uncorroborated hearsay statements only if the surrounding circumstances established that the child's truthfulness is " 'so clear' " that " 'the test of cross-examination would be of marginal utility.' "  (*Lucero L.*, *supra*, 22 Cal. 4th at p. 1249.)

The juvenile court's own concerns about the reliability of I.C.'s hearsay statements—all of which were uncorroborated[2]—demonstrates that there is not

----

[2]  The majority incorrectly asserts I.C.'s statements were corroborated by her "fear at being left alone with Alberto."  (Maj. Opn., pp. 20-21, fn. 8.)  It claims this corroboration exists based on mother's testimony that the morning after I.C. said her father had touched her inappropriately, I.C. asked mother not to go to work and that part of the reason mother took her to school was so I.C. would not be left alone with Alberto. From this, the majority asserts, it can be reasonably inferred that I.C. was afraid to be left alone with Alberto, from which it can be reasonably inferred that I.C. was afraid because of Alberto's sexual abuse.  (*Ibid.*)  I disagree.  This tortured effort to find corroboration distorts mother's testimony, which was simply that *mother* did not want to leave I.C. alone with father because of what I.C. had told her the night before.  It also ignores that mother further testified that I.C. "*did not say she was scared of her father*.  She said she didn't want me to go to work." (Italics added.)  Moreover, while the majority claims it is relying on mother's testimony rather than I.C.'s statements for corroboration, the portion of mother's testimony that the majority relies upon ultimately rests on what I.C. told mother about father's abuse.  The majority does not explain how a truth incompetent hearsay declarant can corroborate her own statements.

2

substantial evidence that meets the *Lucero L.* mandate. The juvenile court found that this was a "very difficult" case, that there was significant evidence that I.C.'s hearsay statements were both reliable and unreliable, but that their reliability was "more compelling." (See Maj. Opn., pp. 13, 15.) The court also recognized this case involves unusual circumstances and that some of I.C.'s hearsay statements were plainly inaccurate. Alberto's conduct, as I.C. described it, was strikingly similar to that of the boy who had previously abused her, including that Alberto penetrated her vagina with a toy train just as the boy had done. In her video-recorded interview at the Child Abuse Listening, Interviewing and Coordination Center (CALICO), during which the interviewer neither challenged I.C.'s contentions nor asked her about the prior abuse, I.C. could not and did not separate fact from fiction. She wove a variety of fantastical stories into her account about Alberto, such as that he molested her in the CALICO interview room itself and also molested her and three young women together in her brother's bed, and repeatedly changed how and when he abused her. During the 24-hour period in which she made her statements, I.C. also spoke inconsistently and recanted her claim of abuse to her mother.

The juvenile court ultimately determined that I.C.'s hearsay was more credible than not, based almost entirely on the video-recorded CALICO interview; it did *not* find that her truthfulness was clear nor could it have. Its explanation of its decision leads to the ineluctable conclusion that cross-examination—had it been possible—would have been very useful in determining I.C.'s truthfulness. Alberto did not object to the admission of any of I.C.'s hearsay statements and I therefore will not address their admissibility. But even if they were all admissible, the court erred in finding Alberto had sexually abused I.C. based on her uncorroborated hearsay alone. And despite a thorough investigation by police and social workers, there was no other evidence to support that finding.

My colleagues quote the juvenile court's explanation of its decision in its entirety but analyze none of it, and do not even bother to discuss any of the evidence submitted

below.  Instead, they give "conclusive effect" to the juvenile court's equivocal view of I.C.'s credibility, as if this were a routine affirmance of a trial court's determination that a *truth competent* testifying witness who was subject to cross-examination was credible.  It is not.  Hearsay and witness testimony are two different things.  The majority conflates them and by doing so avoids engaging in the careful appellate review of the juvenile court's decision to admit and rely on I.C.'s hearsay statements as required by *Lucero L.*  Instead of engaging with the record, the majority simply concludes, "[g]iven the scrupulousness with which the juvenile court evaluated the pros and cons of the hearsay statements, there is no basis on this record for overturning the juvenile court's jurisdictional finding." (Maj. Opn., p. 22.)  This is a statement of admiration for the court's thoughtfulness in which I join, but it is not a judicial review for substantial evidence of I.C.'s clear truthfulness.  As one of my colleagues has written in another context, "To rubberstamp too readily . . . is to abdicate the judicial function entrusted to the court . . . ." (*In re Victor L.* (2010) 182 Cal.App.4th 902, 931.)  Unfortunately, I believe that is precisely what the majority has done here.

I do not view faithful adherence to the *Lucero L.* mandate as a routine or trivial matter.  A child's welfare, her family's future and her parent's reputation can depend on whether a juvenile court finds sexual abuse based solely on hearsay statements of a child who is unable to separate fact from fiction.  As our late colleague from the Fourth Appellate District, Justice Sills, explained:  "T*he hearing on a contested petition alleging child sexual abuse is . . . extraordinarily important.  It is not the sort of thing to be rushed, or taken routinely.  Allegations of child molestation are serious; they merit more than a rubber stamp.  With the exception of death penalty cases, it is hard to imagine an area of the law where there is a* greater need for reliable findings by the trier of fact.  The consequences of being wrong—*on either side*—are too great." (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1754.)  The majority fails to heed this sage caution today.  Its reflexive affirmance of the juvenile court's erroneous decision in disregard of

4

the *Lucero L.* mandate marks a family forever with the stigma of a factually unsupported finding that its father sexually abused his young daughter and contravenes our fundamental principles of due process. It is a grave injustice.

## RELEVANT BACKGROUND

The juvenile court made its decision to rely solely on I.C.'s uncorroborated statements based on the evidence presented at the jurisdictional hearing. This included the jurisdiction/disposition report and addendum of the Alameda County Social Services Agency (Agency), the video-recorded CALICO interviews of I.C. and Julian, and testimony of mother, I.C.'s older half sister, RJ, and an Agency child welfare worker, Sylvina Cooper. Because these are not discussed in the majority opinion, I review them now in considerable detail.

### I.

### *The Jurisdiction/Disposition Report*

The Agency's jurisdiction/disposition report, filed October 1, 2012, discussed the previous sexual abuse of I.C. by a third party and the allegations about Alberto.

**A. The Previous Sexual Abuse of I.C.**

According to the Agency, on July 2, 2012, I.C. and her five-year-old brother, Julian, were playing in their bedroom with an eight-year-old neighbor boy, whom the record indicates was named Oscar. Mother went to check on the children after about 15 minutes because they had gotten quiet. The Agency summarized and attached to its report a Fremont Police Department police report of the incident. The Agency's summary states that when mother entered the bedroom, the children separated from each other. Upon mother's questioning, the boy said, " 'We were kissing.' " I.C. "stated that the boy removed her shoes[,] socks, pants, and underwear. The boy then inserted a wooden train into her vagina. [Mother] asked [I.C.] if the boy did anything else and she said he kissed her. [Mother] asked [I.C.] if the boy put any part of his body inside of her and she replied 'yes'. [Mother] believed the boy put his penis inside of [I.C.'s] vagina."

5

I.C. told the police the boy had kissed her on her mouth, removed her clothing and put a train inside her vagina and that her vagina hurt. The boy admitted only to kissing her on the mouth.

CPS opened a referral for sexual abuse, but its investigation was "inconclusive." The police investigation was closed as "unsubstantiated." I.C. and Julian did not receive counseling, but mother said she did for herself. She and Alberto said that I.C. "became aggressive towards an eleven year-old male cousin visiting the home, by pursuing him and wanting to kiss him," and mentioned the abuse to her babysitter.

The Agency also reported that it received a phone message from mother on September 4, 2012, that the boy (Oscar) had pushed Julian on a playground, although he was required to stay 150 feet from her children and family.

## B. The Allegations Against Alberto

The Agency's report repeated the petition allegations regarding Alberto. These included that he had sexually molested I.C., who on more than one occasion "spontaneously stated to others and to her mother, 'Daddy put his penis on me.' " I.C. had pointed to her vaginal area and complained that it hurt, and said her father put foreign objects in her vagina, including a flower and a train, took off their clothes and kissed her on the mouth and the vagina while lying in Julian's bed, and that she watched a movie in which boys kissed boys and girls kissed girls, all of them while naked.

The Agency attached to its report another Fremont Police Department report by an officer who went to I.C.'s day care center on September 12, 2012, to investigate a possible child molestation. It was reported that I.C. had stated at the center "that her dad was mad at her and he hit the wall. Now there was a hole in the wall." When I.C. was asked again ten minutes later what she had said, she then said, " 'Daddy took his penis and put it on me. Mommy is upset and I went to the doctor. I am fine.' " She also said she hurt a little. The teacher told the police that I.C. had earlier told her that her father had hurt her with his penis and that she was going to the doctor later.

6

Alberto denied he had sexually molested I.C., and mother stated she did not believe he had done so. Both parents believed that her allegations stemmed from her previous sexual abuse by the neighbor boy (Oscar).

Police also spoke with I.C.'s babysitter, the girlfriend of Alberto's son. She said Alberto was aware of allegations that he had touched I.C. inappropriately and was upset and concerned. She was aware of the previous sexual abuse by a neighbor boy and was not aware of anything else inappropriate that had occurred; the children had never mentioned seeing any inappropriate movies, magazines or literature that were sexual in nature; Alberto had never said or done anything inappropriate to her; and she did not believe Alberto would touch I.C. inappropriately.

## C. Forensic Investigation

The police report indicated a physician conducted a sexual assault examination of I.C. on September 12, 2012, and did not see any visible trauma. That evening, the police searched the family home. A crime scene investigator (CSI) photographed the scene and found no signs of semen or other biological fluids in the children's bedroom or the laundry area, and certain items were seized. No forensic evidence was submitted at the jurisdiction hearing in support of the petition allegations.

## D. The Agency's Recommendations

The Agency recommended that I.C. and Julian be declared dependents of the court and placed in mother's home, a restraining order remain in place prohibiting Alberto from residing with the children, the children engage in individual therapy and the parents have individual counseling regarding sexual molestation and parenting skills.

## II.

### *Mother's Testimony at the Jurisdictional Hearing*

Mother testified at the jurisdictional hearing about what occurred on July 2, 2012, consistent with the Agency's account. She testified that a toy train shown to her at the hearing was the one she saw on the bed the day of the incident. There had been only one

toy train in the house, which had been kept in the children's bedroom. After the incident, mother kept it in the trunk of her car.

Mother had looked into obtaining therapy for I.C. Kaiser told her they did not have therapy for children so young and suggested she contact a social worker who had been assigned to their case. She and her husband both called the social worker but did not hear back. She called again and reached the social worker, who told mother there was no therapy available that would be paid for by the State.

In the two months after the incident, mother, Julian and I.C. had many discussions about it. Among other things, they discussed what occurred during the incident, the children's feelings about the incident, the fact that no one had a right to touch their bodies, that there were good touches and bad touches, what places are appropriate places to touch and that nobody had the right to hurt the children. Alberto participated in some of these discussions.

The children did not see Oscar again until Julian started school on or about September 7, 2012. When mother and I.C. were dropping Julian off there, they all saw Oscar attending the same school and subsequently talked about it. A couple of days later, Julian told mother in front of I.C. that Oscar had pushed him down the slide at school, followed him into the lunchroom, called him a loser and destroyed his lunch. Mother called the school and spoke with the principal, asking her to keep Oscar away from Julian. The family talked about Oscar attending Julian's school all the following weekend.

A few days later, on a Tuesday evening, mother was putting the children to bed when I.C. said, "My dad put penis on me." Julian said, "No, that's what Oscar did to you." Mother asked for details. I.C. repeated, "Daddy put his penis on me." Mother thought I.C. also said it happened in her room on the lower bunk bed. I.C. did not tell mother when it had happened nor say anything about being hurt. Mother tried to get I.C. to tell her what happened, "but it didn't seem like it all went together and made very

8

much sense." Mother told I.C., " 'Nobody has the right to touch your body. There's good touches and bad touches. . . . If I touch you like this, this is a good touch. And nobody has the right to hurt you.' " Mother testified that she probably told I.C. that if what she said about her father was true, " 'then your dad would be in trouble.' "

The following morning, Wednesday, I.C. told mother she did not want her to go to work. Mother asked, " 'Do you remember what you told me last night?' " I.C. said " 'Yes' " and then told mother, " 'I was just kidding.' "

Mother was alarmed at what I.C. had said. She had to go to work, so she decided to take I.C. to pre-school, which I.C. loved, until she could figure out why I.C. was saying these things. I.C. normally attended pre-school on Tuesdays and Thursdays only, spending the other weekdays with Alberto from 9:00 a.m. until 2:30 p.m. Before taking I.C. to school, mother woke up Alberto and told him what I.C. had said. He responded " 'That's crazy.' "

That afternoon, mother reached a Fremont Police Department detective who had left a message for her. The detective said I.C. had told pre-school staff that " 'Dad put his penis on me' " and had been brought to a police station. That Tuesday evening and the following morning were the only times I.C. ever talked with mother about Alberto doing sexual things to her.

## III.

### *I.C.'s CALICO Interview*

Ampara Ozuna of CALICO interviewed I.C. on September 12, 2012.[3] Immediately after I.C. agreed to tell the truth and not lie, she said she had engaged in many activities that day, including watching a movie, taking a nap with Bianca, going to San Francisco with her mother and going to the park with her father.

---

[3] I.C.'s interview was video-recorded, played at the jurisdictional hearing and is in the record in video and transcript formats.

9

In response to Ozuna's further questions, I.C. said she had told "Karen" at her school that day that "daddy put penis on me" and "[t]hat he put train on me and then he put a flower on me yesterday." After referring to a circle, she said he "do that on the bed. He do that here." She pointed to the cushions she was sitting on and said, "In this bed." She also said it "was on the—Julian's bed," that "Daddy—dad put a tissue on me—he—he put a—he put—he like—like he put Julian's—hmm, my necklace on me yesterday."

I.C. climbed on the cushions next to her, opened her legs and said "he do this to . . . to my vagina." Twice, she repeated "he do this" and opened her legs, and then said, "he do this and I was here today and he give me a Hi-Five." She said her father "[p]ut a penis and then flower and then the train," took off her shoes, pants, shirt, underwear and socks and kissed her on her mouth when she was on the bed. She said she told him to stop "because he can't do that to touch me here," putting her hand on her crotch as she said this, but he didn't listen to her. Asked what her father was doing when she said "stop it," she said, "Don't do that. Okay. That's—that's mine. If leave my vagina alone, just leave it. Okay. Then he didn't—he didn't leave me alone still," and "[h]e still—he still does—still bothers—he still bothers me." She said she told him to stop as she was laying down on her back with her legs open and that he was lying on the bed with his clothes off "like this," laying against the cushions and opening her legs. She also said that he "knocked the wall," and "[h]e smacked the wall like this." She made slapping motions with her hand and said, "He do it five times and I say 'stop it.'"

Asked if any part of her father's body touched any part of hers, I.C. said, "Yeah. He put penis on me," and that he "[p]ut penis on me, and he put penis on me, he put penis on me yesterday," pointing to her crotch to describe where. She said that he touched her crotch five times, that she told him to stop, that he did not listen to her, and that it did not feel good. Asked if her father put his penis inside her, I.C. said, "Put penis on me."

Asked if anything came out of her father's penis, I.C. said "Hmm, yeah. . . . [¶] It's ducky—. . . [¶] It's a—it's a train." "He kept it—comes out and he puts—and puts

10

up like this and . . . ." When asked, "What puts up?," she said "the train," and that "[t]hat hurts me when he do that." Asked what the train looked like, she pushed her hand along the ground as if pushing a toy and appeared to draw two circles with something on top of them. Asked if the penis is the same thing as a train, she said, "Yeah." I.C. also said that a train came out of the train and that the train was red and the color of the tan paper in front of her.

Questioned further, I.C. said when her father did not listen to her, she got up and ran away to a car in her house, feeling sad "[b]ecause he did stuff to me." Earlier, she had said Julian was at school and her mother was at work when her father molested her. Now she said, "[M]y mommy sleeping and hers not here and I was by myself." Then I.C. "saw her knocking the door" and "[h]er was picking me up and Daddy was not here and Daddy was somewhere else." She told her mother to " 'stop it' and . . . [¶] I said, Daddy, stop it, that's not—that's not yours, that's mine. Anyone [sic] can touch my vagina." Also, "I told her 'stop it.' And her listen to me." Her mother said, " '[S]top.' '[O]h my daddy is going to be in all so much trouble.' " I.C. said her father was going to jail and had told the police, " 'I promise, I won't do it again.' "

Asked if her father did these things to her at any other time, I.C. said both that he did only one time and other times. Asked what happened another time, she said, "He put, hmm, another train on me. [¶ . . . [¶] Okay. A train—a train—a penis and a flower and—and that's it." Asked if it happened anywhere besides Julian's room, I.C. said "Hmm, it was here in my house and here." Asked what she meant by "here," I.C. insisted emphatically and repeatedly that her father did these things "[i]n this bed," and gestured to the cushions by her.

Asked if anything else had happened with her father that made her uncomfortable, I.C. said, "Just the truth" and that it was "[t]he penis, the train, the train, and the flower." Asked if she had ever seen her father do that to anybody else, I.C. responded, "[h]e do that to RJ," whom she identified as her friend and a "big" girl. Asked what she saw her

11

father do to RJ, she said, "Put penis in the flower and the train and train and—and—that's it." She also said, "Daddy take off his clothes and her—then he kiss him (sic)." She went on to say that her father was on the bed with a naked RJ, that she, I.C., was on the bed, that she, I.C., was on a different bed, and that they were all on Julian's bed with her babysitter and her babysitter's sister. Asked why they were all on the bed, she said, "Because we want to do that and we say 'no,' so he didn't stop it and then we say 'no.' Then he didn't stop it." Asked what he did not stop, she said, "Our vaginas. He didn't do it. . . . [¶] He didn't—he want to do—take off our clothes and he want to do it." Asked what he wanted to do, she said, "the bad things" and "[t]he train, the train and train—and the flower and the penis."

After a break, Ozuna asked I.C. if her father put his penis on the outside or inside of her. I.C. now said, "The inside," and that it hurt. As requested, I.C. marked on a drawing where her father had kissed her, identifying her hair, her hand, her body, her vagina and her leg. She said she had clothes on, but that her father "take off my clothes" "in the bean bag" and that his mouth touched her vagina. Asked how she felt when he kissed her vagina, she said "Not good." She now said it happened in Julian's bed four times, a "long time" ago.

Asked if she'd ever seen "adult movies," I.C. said she had, identified "Rapunzel" and "[a] boy and a girl," and said, "The boy and girl kiss together. . . . [¶] One boy kiss a boy and one boy—and one girl kiss a girl." She saw that at her house, and they didn't have clothes. Someone knocked on her door, heard her, and ran away. It was "like a ghost" and she did not know who it was. Asked who put the movie on, she said "It was like RJ or Elmer or mommy or Julian or Kevin," she did not know and "[i]t was just like ghost."

Finally, Ozuna asked I.C. why her father slapped the wall. I.C. said, "He's going to be in jail forever. He's going to be in big trouble. And I don't know why he did do

12

that." He was "furgirated (phonetic)" or "fustradated." She learned that he was going to jail "forever" at school or from RJ.

## IV.

### *Julian's CALICO Interview*

Julian, I.C.'s five-year-old brother, was interviewed by a CALICO interviewer on September 13, 2012.[4] He initially said his sister was making up a lie about their dad, was just confused about it and was lying about Oscar, who did not like Julian anymore. I.C. had not said anything to him about their father. His mother told him I.C. said that "Daddy touched I.C. on her private parts" and that I.C. was confused about their father.

Later, Julian said I.C. told him the day before that her father was "hurting her" in Julian's bed, "touching her on the private parts," and that it happened "[m]ore than one time" and "felt uncomfortable." Julian never saw his father do anything to I.C. or hurt her. He said his sister "doesn't like my dad," and that "mama" told him that. No one had ever touched Julian anywhere on his body where they are not supposed to touch or on his "private parts." He had never seen or been shown an adult movie. Nothing had happened with his father that made him feel uncomfortable.

## V.

### *RJ's Testimony at the Jurisdictional Hearing*

A.C., called "RJ," is I.C.'s half-sister and Alberto's 21-year-old daughter. RJ testified that she lived with Alberto until her parents broke up when she was about nine and for three years when she was in high school, and that she spent time in his home after he remarried. Alberto had never touched RJ inappropriately. RJ had never been in bed with Alberto, I.C. and the babysitter, and Alberto had never inappropriately touched everyone's vagina. RJ had never seen Alberto touch I.C. inappropriately and had no

---

[4] Julian's interview was also played at the jurisdictional hearing and is in the record in video and transcript formats.

13

concerns that he would do so, nor had she ever seen I.C. recoil from, run from, or seem afraid of Alberto. RJ also testified that she had looked after I.C. in January 2013 for three days when mother went out of town. I.C. "kept touching herself down there" and told RJ it was because Oscar had hurt her.

## VI.

### *Sylvina Cooper's Testimony at the Jurisdictional Hearing*

An Agency child welfare worker who worked on the case, Sylvina Cooper, testified, including as an expert witness in risk assessment for child sexual abuse. She said I.C. never mentioned Oscar to her and had mentioned her father only once, at the end of a supervised visit with him, when she asked Cooper "if her father could come home." Since the Agency returned the children to mother, there were no safety incidents or anything notable for Cooper to report.

To Cooper, I.C. presented as being "very, very intelligent and very, very mature, beyond the age of three," had "a very high level of language development" and did not appear to have problems communicating. Cooper believed that most of I.C.'s statements in the CALICO interview about what Alberto did to her were "credible," that I.C. knew the difference between what was true and false, and that I.C. had not confused Alberto with someone else. Cooper noted that I.C. had directly told her mother, school personnel at her day care center, child welfare worker Alma Villa and the CALICO staff that she had been sexually molested by her father. The consistency of I.C.'s story affected Cooper's assessment. Also, Cooper had not identified any motive that I.C. might have for making her allegations.

Cooper thought I.C. made several untrue statements in her CALICO interview. Cooper did not think Alberto molested I.C. with a toy train, but thought the train "could be something—her way of explaining something, like a metaphor." She did not think Alberto had molested I.C. in the CALICO interviewing room, but thought I.C. could have confused time and space at her age. She did not think others had been in the bed with

14

I.C. and her father. Also, at the interview's end I.C. appeared to tire and it was "not unusual for a child that age to begin to fantasize about movies, pictures, flowers." I.C. inaccurately said that her father put his penis in her vagina five times "the day before the interview," but she could not be expected to know the difference between 24 and 48 hours at her age.

Asked why she was "so sure" that father had molested I.C., Cooper said I.C. first told her mother rather than strangers so her story was not "tainted by people that don't know her," was "pretty consistent in what she told her mother in describing the body parts and showing the body parts verbally, in diagrams, drawing the specific body parts, and consistently saying that it's her father," and was "a very intelligent child" who "remember[ed] very, very specific things."

However, Cooper also said I.C.'s claims about Alberto could have been triggered by her recent contact with her molester, Oscar. Asked why it was not a more reasonable explanation that I.C.'s first claim to mother "was simply some kind of fantasy triggered by her contact with the eight-year-old molester at school, a few days prior to the disclosure about her father[]," Cooper responded, "Honestly, I can't speak to that. [¶] But in interviewing both parents, they say that—that the molest by the eight-year-old was discussed in the home quite a bit before the encounter, the brief encounter in September, on the day of taking the child to school." She said it was "possible" that I.C.'s claims about Alberto could be explained by her seeing Oscar at Julian's school a few days before and that the family's discussions could have impacted I.C.'s claims. However, she thought that was less likely than that Alberto had actually molested I.C. because of "I.C.'s very detailed descriptions of what she said that her father did to her. Her use of the words that he put his penis on her. That she told him this was bad, these are bad things, that she kept repeating it was bad. She put gestures. It just seemed very, very specific regarding her father." But Cooper also indicated she had experienced cases in which allegations by young children turned out to be false and "to have been triggered

15

by some revisitation of an earlier molestation." Cooper confirmed that mother sought therapy for I.C. after the incident with Oscar in July 2012 but was unsuccessful, even though the Agency could provide services in such circumstances.

## VII.

### *The Juvenile Court's Jurisdiction Ruling*

At the conclusion of the jurisdictional hearing, the juvenile court announced its ruling. The majority has quoted the court's announcement in full (Maj. Opn., pp. 12-16), so I will not repeat it here. I note only that the court said that "[t]his is a very difficult case because the evidence comes from a three-year-old child who, at times, was very clear in her statements about what happened, and at other times was very unclear, and at times very confusing about the statements that she makes concerning what she alleges her father did to her." After citing *Cindy L.*, *supra*, 17 Cal.4th 15 and *Lucero L.*, *supra*, 22 Cal.4th 1227, it discussed at length evidence that it thought suggested I.C.'s statements were both reliable and unreliable, concluding, "[s]o there's supporting evidence on both sides," and found that "the evidence that supports reliability [is] more compelling." It rejected the "theory that the minor is having a flashback to the July incident and is projecting that incident onto the father" and emphasized what it considered to be I.C.'s clarity and consistency in her repeated accounts to several people in the course of the 24 hours she spoke about what her father had done to her. Based solely on I.C.'s hearsay statements, the court found by a preponderance of the evidence that I.C. had been sexually molested by Alberto.

## DISCUSSION

### I.

### *The Lucero L. Mandate of Clear Truthfulness*

The juvenile court's jurisdictional finding rests entirely on the uncorroborated out-of-court statements of I.C., a non-testifying three-year-old child incapable of separating fact from fiction who was never cross-examined. And not any three-year-old child, but

16

one who two months before had been sexually abused by a neighbor boy—an incident that became the subject of much discussion and concern within her family—in a way that was strikingly similar in many particulars to her allegations about Alberto.

In assessing the sufficiency of such hearsay evidence, we are guided not only by the general standards governing substantial evidence review, but also by the specific mandate set forth by our Supreme Court in *Lucero L.*, *supra*, 22 Cal.4th 1227. *Lucero L.*, and the related case that preceded it, *Cindy L.*, *supra*, 17 Cal.4th 15, are part of a special body of law that grapples with the tension between our paramount concerns with a child's welfare and a parent's due process rights in dependency proceedings. (See *Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1513 [in dependency proceedings, parents have the due process right to cross-examine witnesses and the preparers of agency reports submitted to the court].) This tension is particularly high when a court considers whether to admit and rely on a very young, truth incompetent child's hearsay statements to find sexual abuse.[5] Their use as evidence against a parent denies the parent—and the court—of a critical means by which historically we assess a witness's credibility: cross-examination. As our United States Supreme Court has observed, "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge . . . , the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness." (*Davis v. Alaska* (1974) 415 U.S. 308, 316, italics omitted, quoted in *In re*

---

[5] Generally, truth incompetence or the inability to express oneself so as to be understood are bases for excluding witness testimony. Pursuant to Evidence Code section 701, a person is disqualified from testifying if it is shown by a preponderance of the evidence that the witness is "(1) [i]ncapable of expressing himself or herself concerning the matter so as to be understood . . . or [¶] (2) [i]ncapable of understanding the duty of a witness to tell the truth." (Accord, *People v. Lewis* (2001) 26 Cal.4th 334, 360; *People v. Anderson* (2001) 25 Cal.4th 543, 573.)

17

*Brenda M.* (2008) 160 Cal.App.4th 772, 777 [father improperly precluded from cross-examining the preparer of an agency report as a sanction after he refused to testify].)

As I have indicated, our Supreme Court issued *Lucero L.* after previously determining in *Cindy L.*, that out-of-court statements of a young child in a dependency proceeding may be admitted and relied upon only if the statements show particular indicia of reliability and are corroborated. After *Cindy L.*, the Legislature amended Welfare and Institutions Code section 355 (section 355) to create a hearsay exception applicable to dependency proceedings for uncorroborated out-of court statements of a child under 12 that are contained in a social study,[6] unless a party objecting to their admission establishes the statements were procured by fraud, deceit or undue influence. (§ 355, subds. (a), (c)(1)(B).) Considering this new hearsay exception, the *Lucero L.* court held that, where a child cannot testify because of truth incompetence and her hearsay statements contained in a social study are uncorroborated, these statements are admissible, but may not be the sole support for a jurisdictional finding unless they and their surrounding circumstances so clearly demonstrate the child's truthfulness that " 'the test of cross-examination would be of marginal utility.' " (*Lucero L.*, *supra*, 22 Cal.4th at p. 1249.)

Justice Mosk, writing a plurality opinion that was joined on different issues by concurring justices, concluded that admission of child hearsay under the criteria established by the Legislature in section 355, which partially codified the court's earlier recognition of the similar hearsay exception discussed in *Cindy L.*, *supra*, 17 Cal.4th 15, did not violate due process. (*Lucero L.*, *supra*, 22 Cal.4th at pp. 1243-1244.) However, the *Lucero L.* court noted that " 'admissibility and substantiality of hearsay evidence are

_____

[6] A " 'social study' means any written report furnished to the juvenile court . . . by the county probation or welfare department" in a relevant dependency proceeding. (§ 355, subd. (b)(1).) The video-recorded CALICO interview itself is not a social study (see *ibid.*) and, therefore, it likely is governed by *Cindy L.* and should not have been considered at all. Father does not raise this issue, however, so I will not discuss it further.

different issues.' " (*Id.* at p. 1244.) It recognized there were "due process problems inherent in relying too heavily on the hearsay statements of incompetent minors to make jurisdictional findings *when there has been no opportunity for cross-examining the minor.*"[7] (*Ibid.*, italics added.) It noted that in most other contexts, if the reliability of hearsay has not been established by statute, " 'hearsay evidence alone "is insufficient to satisfy the requirement of due process of law, and mere uncorroborated hearsay does not constitute substantial evidence." ' " (*Id.* at pp. 1244-1245.) Although section 355 created a statutory exception to the hearsay rule for minors under age 12, the court thought it "not apparent . . . why sole reliance on such hearsay statements would not raise the same due process problems as with other hearsay." (*Id.* at p. 1245.) Nor did it "believe that due process is necessarily protected by placing the burden on those opposing the government to prove that the minor's statements were 'the product of fraud, deceit, or undue influence,' as section 355, subdivision (c)(1)(B), provides, in order to keep the statements from being admitted." (*Ibid.*)

The court found the due process problem was "compounded in the case of a child who has been determined to be incompetent to distinguish between truth and falsehood," noting that "a finding of 'truth incompetence' is a factor weighing against the reliability of the child's out-of-court statement." (*Lucero L.*, *supra*, 22 Cal.4th at p. 1246.)

---

[7] This passage shows the fallacy of the majority's view that *Lucero L.*'s reference to "the test of cross-examination" does not mean cross-examination of the minor. (Maj. Opn., pp. 2-3.) As stated in a treatise approvingly quoted by the United Supreme Court in the case upon which *Lucero L.* relies, *Idaho v. Wright* (1990) 497 U.S. 805, " 'The theory of the hearsay rule . . . is that the many possible sources of inaccuracy and untrustworthiness which may lie underneath the bare untested assertion of a witness can best be brought to light and exposed, if they exist, by the test of cross-examination. But this test or security may in a given instance be superfluous; it may be sufficiently clear, in that instance, that the statement offered is free enough from the risk of inaccuracy and untrustworthiness, so that the test of cross-examination would be a work of supererogation.' 5 J. Wigmore, Evidence § 1420, p. 251 (J. Chadbourn rev. 1974).' " (*Id.* at p. 819.)

Moreover, the court observed that in *Cindy L.*, it had required " 'either corroboration or availability for cross examination,' " which " 'safeguards against the possibility that the child is merely fabricating the statement.' " (*Ibid.*)  It also noted that even its decision in *Cindy L.* that the hearsay statements of truth incompetent minors could be "*admitted* as fully competent evidence was predicated at the very least on the court making a finding that 'the statement bears special indicia of reliability.' " (*Ibid.* [quoting *Cindy L.*, *supra*, 17 Cal.4th at p. 34].)

With these concerns in mind, the *Lucero L.* court determined that corroborating evidence was not absolutely required by due process before a juvenile court could rely on a truth incompetent, non-testifying child's hearsay statements at the jurisdictional phase of a dependency proceeding.  (*Lucero L.*, *supra*, 22 Cal.4th at pp. 1248-1249.)[8] However, the court established an exacting standard that must be met before a court may do so.  It held that "section 355 notwithstanding, the out-of-court statements of a child who is subject to a jurisdictional hearing and who is disqualified as a witness because of the lack of capacity to distinguish between truth and falsehood at the time of testifying may not be *relied on exclusively* unless the court finds that 'the time, content and circumstances of the statement provide sufficient indicia of reliability.' " (*Id.* at pp. 1247-1248, italics added.)  In deciding that due process required no less, the court emphasized the interests at stake in a dependency case, which include "the parents' important liberty interest in maintaining custody of their child"—" 'an interest far more precious than any property right.' " (*Id.* at p. 1247 [citing *Santosky v. Kramer* (1982)

---

[8] Justices Kennard and Brown did not opine on whether corroborating evidence is constitutionally required.  (See *Lucero L.*, *supra*, 22 Cal.4th at pp. 1250-1251 (Kennard, J., joined by Brown, J., concurring).)  Justices Chin and Baxter saw no due process problem with basing a jurisdictional decision solely on hearsay evidence so long as the juvenile court determines that the child witness testimony meets the substantial evidence standard.  (See *id.* at pp. 1255-1257 (Chin, J., joined by Baxter, J., concurring).)  The latter two justices thus agreed with the plurality that corroboration is not constitutionally required.

455 U.S. 745, 758-759].)  The court further acknowledged, "the risk of erroneous deprivation . . . is great, because those opposing the government in a section 300 hearing are critically deprived of the right to cross-examination.  This risk is increased by the fact of the hearsay declarant's legal incompetence to testify due to an inability to distinguish between truth and falsehood, which not only makes the declarant unavailable for cross-examination but also detracts from the declarant's reliability." (*Ibid.*)[9]  The court emphasized "the importance of juvenile court scrutiny of the statements of young children who are both legally incompetent and insulated from cross-examination." (*Id.* at p. 1249.)  Quoting the United States Supreme Court, it concluded:  "At least in the case of a truth incompetent minor, the court may rely exclusively on these out-of-court statements only 'if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility . . . .' (*Idaho v. Wright* [1990] 497 U.S. [805,] 820.)" (*Ibid.*)

The competing interests identified in *Lucero L.*—the safety of a child and the liberty interests of a parent in the care and raising of that child—are at the heart of this case as well.  So is I.C's interest[10] in being raised by two parents in an intact and loving family—a setting that is recognized as ideal but experienced by fewer and fewer children

---

[9] This holding reflects the views of a majority of the court.  (See *Lucero L.*, *supra*, 22 Cal.4th at pp. 1250, 1251-1252 (Kennard, J., joined by Brown, J., concurring).)  Justices Chin and Baxter agreed that unreliable, uncorroborated hearsay alone would be insufficient to sustain a jurisdictional finding and "might also violate due process." (*Id.* at p. 1253.)  However, they believed that a trial court's determination that such evidence satisfied the preponderance-of-the-evidence standard and an appellate court's determination that there was substantial evidence to support that finding would ensure that such findings would not be based on unreliable evidence of any kind.  (*Id.* at pp. 1252-1254 (Chin, J., joined by Baxter, J., concurring).)

[10] I.C.'s brother, Julian, is also affected.  Although the dependency proceeding was dismissed as to him, the court's order barring Alberto from living in the family home deprived Julian as well of the opportunity to be raised by his parents together in an intact family.

21

in America today.  And I would be remiss if I did not mention another significant interest at stake here.  While this is not a criminal case and Alberto has not been convicted of any crime, the reality is, as my colleagues acknowledge (Maj. Opn., p. 5), a finding that Alberto sexually abused his daughter carries more "social opprobrium" than almost any other act.  (*Blanca P. v. Superior Court*, *supra*, 45 Cal.App.4th at p. 1752 ["Few crimes carry as much (or as much deserved) social opprobrium as child molestation.  Most people would rather be accused of bank robbery."].)  Moreover, because a parent's denial that molestation occurred is frequently used as evidence supporting removal of a child (*see id*. at pp. 1752-1753 [discussing the " 'confession dilemma' "]), "[i]f an injustice occurs . . . , the hard fact of life is that the very innocence of the parent will in all likelihood render the family asunder.  And it is also irrefutable that no honorable person will want—or should have—to admit to a despicable sexual act of which he or she is innocent." (*Id*. at p. 1754.)  For these reasons, "[t]he hearing on a contested petition alleging child sexual abuse is . . . extraordinarily important" (*ibid*.), and we must carefully review decisions in difficult cases like the one before us.

## II.
### *The Juvenile Court Did Not Find, and There is No Substantial Evidence, That I.C.'s Truthfulness Was Clear.*

At the end of the jurisdictional hearing on March 27, 2013, the juvenile court announced its decision to rely on I.C.'s uncorroborated out-of-court statements that Alberto sexually abused her.  The court identified what it considered to be reliable and unreliable aspects of I.C.'s hearsay statements and then said, "So there's supporting evidence on both sides.  There's evidence that supports reliability of her statements, and there's evidence that supports a conclusion that her statements are unreliable."  It then concluded that "the evidence that supports reliability [is] more compelling" and proceeded to rely solely on I.C.'s statements to sustain the petition allegations that Alberto had sexually abused her.

22

The juvenile court's weighing essentially was a determination that I.C.'s hearsay statements were reliable by a preponderance of the evidence. The broad and relatively lenient preponderance of the evidence standard generally governs a juvenile court's determination of whether there is sufficient evidence to support jurisdiction. However, *Lucero L.* makes clear that more is required before the court may base jurisdictional findings *solely* on uncorroborated hearsay statements by a young, truth incompetent, non-testifying minor such as I.C. In that circumstance, the court must find from the statements made and the surrounding circumstances that the minor's truthfulness is clear—*so clear that cross-examination would be of little use*. The court did not determine that this was the case here, nor could it have. Indeed, even in applying its own, less exacting, test, the court referred to this as a "very difficult" case. I fully agree. And if the case was "very difficult" under the more-reliable-than-not standard applied by the juvenile court, I.C.'s hearsay statements cannot be relied on exclusively when examined under the more exacting test required by *Lucero L.*.

The majority concludes that it must affirm based on the juvenile court's determination that I.C.'s CALICO interview statements were more reliable than not, particularly because of the "scrupulousness with which the juvenile court evaluated the pros and cons of the hearsay statements." (Maj. Opn., pp. 20, 22.) It contends there is a "significant difference between the juvenile court's decision in *Lucero L.* and the one here" because the court reviewed I.C.'s video-recorded CALICO interview, while in *Lucero L.*, there is nothing to indicate the court reviewed the victim's videotaped interview. (*Id.* at pp. 17-20.) It concludes that the court's determination of I.C.'s credibility "was undoubtedly included in its powers to evaluate the evidence, the same power exercised by any trier of fact in any context viewing a recording or depiction, and the exercise of which is conclusive for purposes of this appeal." (*Id.* at p. 20.)

The majority's analysis misconceives the *Lucero L.* test. It is correct that we generally do not second-guess a trial court's views regarding the credibility of *testifying*

23

*witnesses.* I have no quarrel with the cases cited by the majority that involve that proposition. (See *In re I.J.* (2013) 56 Cal.4th 766, 773 [stating that generally " ' "issues of . . . credibility are the province of the trial court" ' "]; *People v. Mayfield* (1997) 14 Cal.4th 668, 748, overruled on other grounds by *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2 [affirming the trial court's admission of a videotape to impeach defendant's testimony pursuant to Evidence Code section 352]; *In re Megan S.* (2002) 104 Cal.App.4th 247, 251 [noting that "[w]e do not pass on the credibility of witnesses" in a case that involved live testimony].) However, I.C. was *not* a testifying witness; rather, she was incompetent to testify precisely because she was incapable of separating fact from fiction, and her out-of-court, unchallenged statements were the only evidence that Alberto sexually abused her. Therefore, these cases are not relevant here, nor are the two other cases cited by the majority. (See *People v. Eccleston* (2001) 89 Cal.App.4th 436, 440-441 [child's hearsay statements of sexual abuse were admitted pursuant to Penal Code section 1360 where a witness testified that she interviewed the child only after she was "convinced the victim knew the difference between truth and falsehood" and the abuser provided corroboration]; *People v. Avila* (2006) 38 Cal.4th 491, 592 [recorded police interview used to impeach a testifying defendant's testimony].)

I am not aware of any appellate court that has so precipitously acquiesced in a trial court's determination of a hearsay declarant's credibility without further review. Indeed, the majority's approach flies in the face of the extensive concerns addressed in our jurisprudence regarding a fact finder's reliance on hearsay statements, of which *Lucero L.* is a part. The majority's view that the juvenile court's credibility determination is "conclusive" on this court has no legal basis under the circumstances of this case.[11]

---

[11] Indeed, the juvenile court observed nothing about I.C. in the video-recorded CALICO interview that we cannot observe ourselves, making it arguable that we should not give *any* deference to its credibility assessments from this interview and other documentary evidence. (See *In re Avena* (1996) 12 Cal.4th 694, 710 [raising this same issue regarding a referee's factual findings from a hearing transcript]; see also *Lilly v.*

24

While I agree that the juvenile court thoughtfully evaluated the evidence, our duty nonetheless is to determine if there is substantial evidence that I.C.'s truthfulness was " 'so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility.' " (*Lucero L.*, *supra*, 22 Cal.4th at p. 1249.)  I conclude there is not, based on my review of the entire record in the light most favorable to the judgment below.  (See *In re I.J.*, *supra*, 56 Cal.4th at p. 773.)

The juvenile court acknowledged that significant aspects of I.C.'s hearsay statements about Alberto were the product of confusion, projection and/or imagination and were therefore unreliable, but concluded there were, in its view, more compelling indicia of reliability.  These indicia included that I.C.'s statement to mother that Alberto put his penis on her was "spontaneous" and clear, her statements were consistent in their "core allegations," her statements were not prompted by any of the adults she was talking with, and there was no evidence that she had a motive to lie.  The court also noted that I.C. did not use the word penis in regard to Oscar, did not accuse any other male or mention Oscar in her statement to mother, was clear that the incident with her father occurred while mother was at work and Julian was at school, said what her father did to her hurt, and did not want her mother to go to work the day after she first told her about her father putting his penis on her.

A number of the court's evidentiary conclusions are not supported by the record. I.C.'s initial statement to her mother was not entirely "spontaneous" in light of the family's extensive discussions about Oscar and sexual abuse in the days just before she made it; a number of I.C.'s core allegations were inconsistent and confused[12]; the record

---

*Virginia* (1999) 527 U.S. 116, 137-138 [the Supreme Court holding pre-*Crawford* that appellate courts should independently review whether a hearsay statement has "particularized guarantees of trustworthiness" in evaluating whether its admission violates the Confrontation Clause].)

[12]  For example, I.C. said in her CALICO interview that Alberto sexually assaulted her in the interview room itself; that he assaulted her one time, multiple times, four times,

indicates I.C. was familiar with words such as penis because of Oscar's prior abuse of her and the subsequent investigation and discussions of it; and I.C. did not consistently indicate that her father abused her when mother was at work, saying at one point in the CALICO interview that her mother was sleeping. But regardless of these matters, we should reverse here for a more important reason: the court found that significant evidence indicated I.C.'s statements about Alberto were *unreliable*. Its finding demonstrates that no reasonable fact finder could conclude that I.C.'s truthfulness was *clear*—again, a finding that the court did not make, and which its ruling indicates it would not have made if it had directly addressed this penultimate question.[13]

Three aspects of the court's decision most clearly demonstrate the court did not find I.C.'s truthfulness was clear. First, as indicated by the court's citation to *Lucero L.*, it found that I.C. was truth incompetent.[14] This is a key factor weighing against the reliability of her out-of-court statements. (See *Lucero L.*, *supra*, 22 Cal.4th at p. 1246.)

Second, the court recognized that I.C. made significant statements that were inaccurate, such as when she insisted that Alberto sexually abused her in the CALICO interview room and that he also molested her, her adult half-sister RJ, her babysitter and the babysitter's sister together in one bed. Indeed, in her CALICO interview, I.C.

---

yesterday, and a long time ago; that "penis" and "train" were the same; and that a "train" came out of Alberto's penis. She said Alberto put a penis, a flower and a train on her and on RJ, which is anything but clear. Perhaps most importantly, she told her mother the morning after her first statement about Alberto's abuse that she was "just kidding."

[13] In my view, the juvenile court, regardless of its citation to *Lucero L.*, erred by applying an insufficient "preponderance of reliability" standard to I.C.'s statements when the *Lucero L.* mandate called for more, i.e., a determination that surrounding circumstances indicated that she was clearly truthful. However, Alberto does not claim on appeal that the juvenile court erred as a matter of law by failing to apply the correct legal standard. Therefore, I do not address this issue further.

[14] I have found nothing in the record indicating that the juvenile court expressly found I.C. to be truth incompetent. Nonetheless, its citation to *Lucero L.* indicates that it found this to be the case.

26

interwove her account with fantastical statements. Immediately after promising to tell the truth, she recounted that she had engaged in numerous activities that day—such as taking a nap with her babysitter and going to the park with her father—that could not have occurred, since her mother took her in the morning from their home to pre-school, from which I.C. was taken into custody by the police. She said she was visited by a ghost as she watched movies of naked boys kissing boys and girls kissing girls. She recounted that her father said to the police, " 'I promise, I won't do it again,' " when there is no indication she knew of such a talk and her father consistently denied molesting her. And this is by no means an exhaustive list of I.C.'s clearly untruthful statements.

Third, the court recognized that I.C.'s account of Alberto's actions was strikingly similar to Oscar's actions in sexually abusing her just months before, and that this prior abuse was discussed at great length by the family in the weeks and even days just before I.C. made her statements about Alberto. This was certainly the case. I.C. told mother that Oscar took off her shoes, pants, socks and underwear; she said in the CALICO interview that Alberto took off her shoes, pants, shirt, socks and underwear. The children told mother and the police that Oscar kissed I.C. on the mouth; I.C. said in the CALICO interview that Alberto kissed her on her mouth. Oscar's kissing and molestation of I.C. took place at home, in the children's bedroom, on Julian's bed; I.C. said in the CALICO interview that Alberto kissed and molested her in the children's bedroom on Julian's bed (as well as elsewhere). Oscar put a train inside I.C.'s vagina; I.C. said in the CALICO interview that Alberto put a train on her. I.C. told police Oscar hurt her vagina; in the CALICO interview she pointed to her vagina and said it hurt "just a little" because of Alberto's abuse. I.C.'s mother took I.C. to the doctor after the incident with Oscar; I.C. said in the CALICO interview, "Mommy is upset and I went to the doctor."

These striking similarities cannot be disregarded in any evaluation of the record. In applying a substantial evidence standard of review, I accept the juvenile court's conclusions that I.C. was not *confusing* what happened with Oscar with what she claimed

happened with Alberto and that there was no evidence that she was motivated to lie. But that does not address whether she imagined or fabricated the incident with Alberto based on what Oscar had done to her in the same way she fabricated numerous other things in her CALICO interview. As the *Lucero L.* court observed, the indicia of reliability provide a substitute for corroboration and cross-examination which are the usual " 'safeguards against the possibility that the child is merely fabricating the statement.' " (*Lucero L.*, *supra*, 22 Cal.4th at p. 1246.) And, as the juvenile court acknowledged, I.C.'s CALICO interview was rife with imagination and storytelling.

As I have mentioned, the court referred to this as a "very difficult" case. Significantly, the plurality in *Lucero L.* made a similar statement in applying its mandate to the facts of that case, characterizing the question of whether the statements made by the child in that case, Lucero L., were sufficiently reliable, as "close." (*Lucero L.*, *supra*, 22 Cal.4th at p.1250.) Those indicia were far greater than any in the present case. For example, the child in *Lucero L.* did not make fantastical, confused or inconsistent statements, she made her accusations over months rather than hours, and there was credible evidence that father had sexually abused another daughter in the past.

If the circumstances in *Lucero L.* presented a "close" call regarding Lucero L.'s truthfulness, the circumstances here do not come close to establishing that I.C. was clearly truthful. Unfortunately, my colleagues do not address this question. After careful consideration and thorough review of the entire record, I conclude that the juvenile court did not find, and that a reasonable fact finder could not find, that I.C.'s truthfulness was so clear as to make the test of cross-examination of marginal utility. Therefore, pursuant to *Lucero L.*, the court erred when it decided to rely solely on I.C.'s hearsay statements to find that Alberto had sexually abused her. This error was the basis for the court's assertion of jurisdiction and later disposition orders. I would reverse them on this ground.

28

_____
STEWART, J.

_In re I.C._ (A141143)

29

Trial Court:                                    Alameda Superior Court

Trial Judge:                                    Honorable Willie Lott

Attorney for Objector and Appellant:            Louise E. Collari

Attorneys for Plaintiff and Respondent:         Donna Ziegler, County Counsel for the
                                                County of Alameda, Melinda Leong
                                                Capozzi, Deputy County Counsel for the
                                                County of Alameda